FILED

2015 Sep-29  PM 04:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | |
|---|---|
| **JERRY BARNES,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 4:13-CV-619-VEH** |
| | ) |
| **MIKE BOLTON, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

---

## MEMORANDUM OPINION AND ORDER

## I.   INTRODUCTION AND PROCEDURAL HISTORY

Plaintiff Jerry Barnes ("Mr. Barnes") initiated this civil rights case on April 4, 2013. (Doc. 1). On July 17, 2013, Mr. Barnes filed an amended complaint. (Doc. 17). Pursuant to this court's order (Doc. 26), entered on January 13, 2014, Mr. Barnes filed a second amended complaint (Doc. 27) on February 3, 2014.

The second amended complaint asserts claims under 42 U.S.C. § 1983 (*id.* ¶ 1), arising out of an alleged warrantless law enforcement incident which occurred at Mr. Barnes's residence on or about November 17, 2012. (Doc. 27 ¶ 11). The defendants are various officers assigned to work for the Etowah County Sheriff's Office Drug Task Force. (*Id.* ¶ 6). The five named defendants in Mr. Barnes's amended pleading are:   Scott Lumpkin ("Officer S. Lumpkin"), Mike Bolton

("Officer Bolton"), Cole Lumpkin ("Officer C. Lumpkin"), Clark Thompson ("Officer Thompson") (collectively, the "Gadsden Officers"), and Tim Waldrop ("Deputy Waldrop"). (Doc. 27 at 1; *id.* ¶¶ 6-10). Mr. Barnes has sued these five defendants in their personal capacities only.

Mr. Barnes's second amended complaint initially contained five counts. However, after the court's Rule 12(b)(6) ruling (Doc. 37), entered on May 29, 2015, only Counts One and Three remain.[1] Count One is a claim for illegal seizure asserted against all defendants. (Doc. 27 ¶ 41). Count Three is a claim for illegal search against Deputy Waldrop and Officers C. Lumpkin and Thompson. (*Id.* ¶ 43).

Pending before the court are the Motion for Summary Judgment (Doc. 49) filed by Officers Thompson, C. Lumpkin, S. Lumpkin, and Bolton (the "Gadsden Officers' Motion"), on April 3, 2015, and the Motion for Summary Judgment (Doc. 51) filed by Deputy Waldrop ("Deputy Waldrop's Motion") on that same date. Defendants filed their respective evidentiary materials and briefs on April 3, 2015. (Docs. 50, 54,

---

[1] The court's May 29, 2014, memorandum opinion and order expressly dismissed Counts Four (for excessive use of force) and Five (for violation of the Second Amendment) of Mr. Barnes's complaint with prejudice and noted with respect to Count Two–an illegal seizure claim against an unknown defendant (Doc. 27 ¶ 42)–that normally "fictitious-party pleading is not permitted in federal court." (*See* Doc. 37 at 2 n.1 (citing *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010))). Since that decision, Mr. Barnes has not sought to amend his complaint by naming a new defendant for Count Two. Mr. Barnes also does not mention that claim when opposing summary judgment. Consequently, to the extent that Count Two was ever viable before this court, such claim is due to be dismissed on summary judgment because Mr. Barnes has abandoned it.

52, 53).

Mr. Barnes separately opposed both motions on May 15, 2015. (Docs. 57, 58). Defendants followed with their replies on May 22, 2015. (Docs. 59, 60). Accordingly, both motions are now under submission and, for the reasons explained below, the Gadsden Officers' Motion is **GRANTED** while Deputy Waldrop's Motion is **GRANTED IN PART** and otherwise is **DENIED**.

## II.    APPLICABLE STANDARDS

### A.    Summary Judgment Generally

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R . Civ. P. 56(c). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510,  91 L. Ed. 2d 202 (1986). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.'" *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

3

475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)).

Finally "[i]f the movant bears the burden of proof on an issue, because, as a defendant, it is asserting an affirmative defense, it must establish that there is no genuine issue of material fact as to any element of that defense." *International Stamp*, 456 F.3d at 1274 (citing *Martin v. Alamo Community College Dist.*, 353 F.3d 409, 412 (5th Cir. 2003)).

### B.    Qualified Immunity

All defendants assert that qualified immunity bars Mr. Barnes's § 1983 claims brought against them in their personal capacities. (Doc. 54 at 22[2]; *see also* Doc. 52 at 4 ("Waldrop and all Defendants are entitled to qualified immunity because their actions were lawful–to secure the arrest of Blackburn and to ensure their safety that no one else was lurking in the shadows of the residence that was armed and could shoot them.")). "The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (internal quotation marks omitted) (quoting *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003)). "To receive qualified immunity, a government

---

[2]   Any page references to Doc. 54 correspond with the court's CM/ECF numbering system.

official first must prove that he was acting within his discretionary authority." *Id*.

This is a two-part test. Under the first step, "the defendant must [prove that he or she was] performing a function that, but for the alleged constitutional infirmity, would have fallen within his legitimate job description." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). Next, the defendant must prove that he or she was "executing that job-related function." *Id.* at 1267. "Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." *Cottone*, 326 F.3d at 1358.[3]

Until 2009, the Supreme Court had required a two-part inquiry to determine the applicability of qualified immunity, as established by *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). Under the *Saucier* test, "[t]he threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S. Ct. 2508, 2513,153 L. Ed. 2d 666 (2002).

If, under the plaintiff's allegations, the defendants would have violated a constitutional right, "the next, sequential step is to ask whether the right was clearly

---

[3] Here, there is no dispute over whether the individual defendants were all  acting within the scope of their discretionary authority. (*See, e.g.*, Doc. 59 at 2 ("Plaintiff did not challenge [Deputy] Waldrop's assertion that he acted within his discretionary authority.")).

established." *Cottone*, 326 F.3d at 1358 (quoting *Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156). The "clearly established" requirement is designed to assure that officers have fair notice of the conduct which is proscribed. *Hope*, 536 U.S. at 739, 122 S. Ct. at 2515. This second inquiry ensures "that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier*, 533 U.S. at 206, 121 S. Ct. at 2158.

The "unlawfulness must be apparent" under preexisting law.[4] *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987) (citing *Malley v. Briggs*, 475 U.S. 335, 344-45, 106 S. Ct. 1092, 1097-98, 89 L. Ed. 2d 271 (1986)). Therefore, a temporal requirement exists related to this inquiry. More particularly, a plaintiff must show that a reasonable public officer would not have believed her actions to be lawful in light of law that was clearly established at the time of the purported violation. *See Anderson*, 483 U.S. at 639, 107 S. Ct. at 3038 ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action[,] assessed in light of the legal rules that were 'clearly established' at the time it was taken[.]") (emphasis added) (citation omitted);

---

[4]   Only Supreme Court, Eleventh Circuit, and Alabama Supreme Court cases can "clearly establish" the law in this litigation. *See Thomas v. Roberts*, 323 F.3d 950, 953 (11th Cir. 2003) ("In this circuit, rights are 'clearly established' by decisions of the Supreme Court, this court, or the highest court of the state in which the case arose." (citing *Hamilton v. Cannon*, 80 F.3d 1525, 1532 n.7 (11th Cir. 1996))).

*Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 599, 160 L. Ed. 2d 583 (2004) ("If the law <u>at that time</u> did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.") (emphasis added); *Brosseau*, 543 U.S. at 198, 125 S. Ct. at 599 ("Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law <u>at the time</u> of the conduct.") (emphasis added); *see also Johnson v. Clifton*, 74 F.3d 1087, 1093 (11th Cir. 1996) ("We know of no [preexisting] case which might have clearly told Clifton that he could not take the disciplinary action indicated by an investigation which was initiated before he even knew about the allegedly protected speech, and in circumstances where the public concern implication was doubtful.").

However, the *Saucier* framework was made non-mandatory by the Supreme Court in *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009), in which the Court concluded that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." Thus, "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

Despite the Supreme Court's modification of *Saucier*'s analytical process, the substantive analysis remains unchanged; an officer is entitled to qualified immunity protection as long as he "could have believed" his conduct was lawful. *Hunter v. Bryan*, 502 U.S. 224, 227, 112 S. Ct. 534, 536, 116 L. Ed. 2d 589 (1991).Therefore, to deny immunity, a plaintiff must affirmatively demonstrate that "no reasonable competent officer would have" acted as the public official did. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986).

## III.   FACTUAL BACKGROUND[5]

Mr. Barnes lived at 1222 Ratliff Street, Gadsden, Alabama, on November 17, 2012, the date of the law enforcement incident complained about in this case, and he still lives there now. AF No. 1.[6] The property is owned by Mr. Barnes's sister, Glenda

---

[5]  Mr. Barnes has no objection to the factual summary provided by the Gadsden Officers in support of their Motion. (Doc. 58 at 2; *see also* Doc. 54 at 3-22 ¶¶ 1-96). The court adopts the Gadsden Officers' facts for summary judgment purposes, but does not include all 96 paragraphs as the court's analysis turns on a more limited subsection of those facts admitted by Mr. Barnes. This statement does not represent actual findings of fact. *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007). Instead, the court has provided this statement simply to place the court's legal analysis in the context of this particular case or controversy.

[6]  The designation "AF" stands for admitted fact and indicates a fact offered by Defendants that Mr. Barnes has admitted in his written submissions on summary judgment, in his deposition testimony, or by virtue of any other evidence offered in support of his case. Under Appendix II of the court's uniform initial order (Doc. 6) entered on April 8, 2012, "[a]ll statements of fact must be supported by specific reference to evidentiary submissions." (*Id.* at 16). For Mr. Barnes, more specifically, this means that "[a]ny statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based." (*Id.* at 17). Consequently, whenever Mr. Barnes has inadequately asserted a dispute over a fact that Defendants have otherwise substantiated with an evidentiary citation, the court has

Blackburn ("Ms. Blackburn"), and Mr. Barnes pays her about $50 weekly to cover utilities and other expenses for living there. AF Nos. 2, 6.

Ms. Blackburn was previously married to Stephen Lloyd Blackburn ("Mr. Blackburn"), but she had divorced from him by the time of the events of this case in November 2012. AF No. 2. Prior to their divorce, Mr. Blackburn had lived at the 1222 Ratliff Street property for several years with Ms. Blackburn. AF No. 4.

In or around 2010, Mr. Blackburn went to prison and Mr. Barnes subsequently moved into the house with his sister and another occupant named Ralph Mathis ("Mr. Mathis"). AF No. 5. Eventually, Ms. Blackburn moved out and a new occupant, Paul Thompson ("Mr. Thompson"), moved in at some point during November 2012. *Id.*

On the morning of November 17, 2012, "barely" after daylight, Mr. Barnes woke up with someone beating on his back door. AF No. 8. Mr. Barnes refers to the door on which someone was beating as the "back door," but it is actually located on the side of the house. AF No. 9.1. The "bedroom" into which the back door opens was

---

reviewed the cited evidence and, if it in fact fairly supports Defendants' factual assertion, has accepted Defendants' fact. On the other hand, whenever Mr. Barnes has adequately disputed a fact offered by Defendants, the court has reviewed the evidence cited by Mr. Barnes and, if it in fact fairly supports Mr. Barnes's factual assertion, has accepted Mr. Barnes's version. The court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of Defendants' statement of undisputed facts as set forth in Doc. 54 and responded to by Mr. Barnes in Doc. 58. A number following a decimal point corresponds to the particular sentence within the numbered statement of facts. For example, (AF No. 9.2) would indicate the second sentence of paragraph 9 of Defendants' facts is the subject of the court's citation to the record.

not anyone's bedroom at the time. AF No. 9.2. This "back door" was the customary mode of entrance and exit for the home. AF No. 9.3.

Mr. Barnes arose, picked up his Glock 26, 9mm pistol (that was fully loaded), and went to the door. AF Nos. 10, 16. Mr. Barnes testified that with the level of noise at the door, he thought someone was trying to get in the house. AF No. 11. His housemate, Mr. Mathis, had also awakened and was behind him in that back room. AF No. 12. Mr. Thompson was not present in the home that morning. AF No. 3.2.

Mr. Barnes opened the door (to the inside) far enough to "stick [his] head out," when he realized that several law enforcement officers were outside his door. AF No. 13.[7] The officer(s) asked if Mr. Blackburn were there, to which Mr. Barnes replied,

---

[7]   The court notes that, in responding to Deputy Waldrop's Motion, Mr. Barnes factually contends that "Defendants were not identifiable as law enforcement." (Doc. 57 at 2 ¶ 12). Mr. Barnes cites to his deposition testimony (Doc. 50-1 at 56) for evidentiary support. However, the relevant excerpt reveals Mr. Barnes's awareness that the people who were at his door were law enforcement officers:

Q.     Who was it?

A.     The deputies.

Q.     No doubt in your mind?

A.     I assumed that, yeah, because everybody has got guns. Everybody is wearing vests. There was not indication as far as labels on the front that I saw.

Q.     Right. But at that point you concluded they were law - - the law?

A.     Yes, yes.

(Doc. 50-1 at 55-56).

"No, he hasn't lived here in three years." AF No. 14.

At this point the door was opened more, and Mr. Barnes's pistol was in his right hand on top of the knob behind the door. AF No. 15.1. Mr. Barnes intended to keep the pistol hidden because he did not want the officers to react the way they in fact did react. AF No. 15.2. In other words, he was concerned about their reaction to his having a firearm in his hand. AF No. 16.

While Mr. Barnes was answering questions at the door, one or more officers "holler[ed] he has a gun." AF No. 18. Mr. Barnes testified that the officers already had their weapons drawn when he opened the door, but did not know whether they were actually pointing them at him or not. AF No. 19. Mr. Barnes heard multiple officers telling him to drop the gun and lie down. AF No. 20.

As Mr. Barnes was putting the pistol down, one of the officers grabbed his left arm, then his right arm, and Mr. Barnes was pulled out of the house. AF No. 21. At the time the pistol was at Mr. Barnes's feet to the right, just in front of him and would have been at the level of his head if he had stretched out on the ground. AF No. 22.1

Mr. Barnes was brought all the way out into the gravel driveway, beyond the short stoop (on which he would not have fit). AF No. 22.2. Mr. Barnes was taken down by the officers and handcuffed while lying on the gravel. AF No. 23. Mr. Barnes was then stood up and his pockets patted. AF No. 24. Mr. Barnes remained

outside, standing next to his truck as two or three officers went inside the house. AF Nos. 24, 25. They were "just looking for people in the house" in every room rather than conducting a "more thorough search of the [place.]" AF Nos. 76, 77. A few minutes later, Mr. Barnes saw the officers exit the house. AF No. 28.

Mr. Barnes has no knowledge as to where any of the officers went inside the house although he speculates that an officer left a footprint on a wedding dress hanging in the back bedroom off the kitchen. AF No. 27.1. At the same time, Mr. Barnes does not know how long it has been since anyone, including his sister, had been in the back bedroom where the dress was located. AF No. 27.2.

### Deputy Waldrop's Actions

Deputy Waldrop instructed the cuffs to be taken off Mr. Barnes and then he told Mr. Barnes to go inside the house with him. *Id.* After the house had been secured by Officers C. Lumpkin and S. Lumpkin, Deputy Waldrop and Mr. Barnes went inside the residence to the kitchen. AF No. 29; AF No. 86.

Deputy Waldrop told Mr. Barnes he was stupid for answering the door with a gun, came close to getting shot, and that he had "better get right with his maker." AF No. 29. The exchange between Deputy Waldrop and Mr. Barnes turned into an

argument. AF No. 39.2.[8] Deputy Waldrop remained inside for approximately one minute. AF No. 39.3.[9]

### Officer C. Lumpkin's Actions

Officer C. Lumpkin was one of the Gadsden Officers who entered Mr. Barnes's home when he saw someone else (who turned out to be Mr. Mathis) inside the door. AF No. 46.1. Officer C. Lumpkin went inside to address Mr. Mathis and to "clear" the rest of the house. *Id.*; AF No. 46.2.

To clear the house, Officer C. Lumpkin testified that he and another officer walked through it to make sure there were no more persons in there. AF No. 47. The other person who entered the residence was his brother, Officer S. Lumpkin. AF No. 74. Officer C. Lumpkin indicated that their check for any other people in the house was for officers' safety purposes, as they had already encountered someone with a gun. AF No. 48.

Officer C. Lumpkin has done many round-ups, and this is the only occasion when a person answered the door with a gun in his hand. AF No. 49.1. He indicated that such an encounter was very unusual and testified that it was a "little bit scary"

---

[8] Mr. Barnes does not dispute this fact taken from Deputy Waldrop's factual summary in his brief. (Doc. 57 at 2; *see also* Doc. 52 at 9 ¶ 39).

[9] Mr. Barnes does not dispute this fact taken from Deputy Waldrop's factual summary in his brief. (Doc. 57 at 2; *see also* Doc. 52 at 9 ¶ 39).

to him. AF No. 49.2.

## Officer Thompson's Actions

Officer Thompson was among the officers who initially approached the door (and possibly was the one who knocked on it loudly). AF Nos. 52.1, 52.2. However, during the course of events on November 17, 2012, Officer Thompson did not ever step inside Mr. Barnes's home. AF No. 58.

## IV.    ANALYSIS

### A.    Count One–Illegal Seizure of Mr. Barnes

In Count One of his complaint, which is brought against all defendants, Mr. Barnes contends that:

> By seizing Plaintiff's person without probable cause and without a warrant, all five Defendants violated Plaintiff's right to be free from unreasonable seizures in violation of the rights guaranteed by the 4th Amendment and incorporated against the states by the 14th Amendment.

(Doc. 27 at 7 ¶ 41). The Fourth Amendment establishes "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.

"[A] seizure occurs when an officer, 'by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . .'" *Roberts v. Spielman*, 643 F.3d 899, 905 (11th Cir. 2011) (quoting *Terry v. Ohio*, 392 U.S. 1, 19

n.16, 88 S. Ct. 1868, 1879 n.16, 20 L. Ed. 2d 889 (1968)). Further, "[a]n encounter between a police officer and a citizen becomes a seizure when 'a reasonable person would not feel free to terminate the encounter.'" *Roberts*, 643 F.3d at 905 (quoting *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011) (quotation marks omitted)); *see also Terry*, 392 U.S. at 16, 88 S. Ct. at 1877 ("It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime–'arrests' in traditional terminology.").

Assuming without deciding that each defendant who was present at Mr. Barnes's house engaged in some degree of seizure-qualifying conduct,[10] Mr. Barnes's illegal seizure claim fails because Defendants acted constitutionally under the circumstances, including the reasonably perceived danger created by the firearm that Mr. Barnes held in his hand when he opened the door to his residence. Alternatively, to the extent that Defendants impermissibly crossed a constitutional line, they did not violate clearly established law or act in an obviously egregious manner and, thus, qualified immunity protects them from being personally liable to Mr. Barnes on this claim.

Concerning the constitutionality of Defendants' seizure of Mr. Barnes, the

---

[10] In their Motion, the Gadsden Officers suggest that the record shows that only Deputy Waldrop seized Mr. Barnes because he was the sole defendant who made physical contact with Mr. Barnes at the doorway. (Doc. 54 at 23).

court is guided by the Supreme Court's seminal decision in *Terry*, *supra*. Under

*Terry*,

> the police may stop and briefly detain a person to investigate a
> reasonable suspicion that he is involved in criminal activity, even
> though probable cause is lacking." *United States v. Williams*, 876 F.2d
> 1521, 1523 (11th Cir. 1989). To justify a *Terry* stop, the officers must
> "have a reasonable, articulable suspicion based on objective facts that
> the person has engaged in, or is about to engage in, criminal activity."
> *United States v. Lindsey*, 482 F.3d 1285, 1290 (11th Cir. 2007) (quoting
> *United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000)), *cert.
> denied* 552 U.S. 974, 128 S. Ct. 438, 169 L. Ed. 2d 305 (2007). In
> connection with a *Terry* stop, an officer may conduct a pat-down search
> if he has reason to believe that his own safety or the safety of others is
> at risk. *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883. "<u>The officer need not be
> *absolutely certain* that the individual is armed; the issue is whether a
> reasonably prudent man in the circumstances would be warranted in the
> belief that his safety or that of others was in danger</u>." *Id.* (emphasis
> added).

*United States v. White*, 593 F.3d 1199, 1202-03 (11th Cir. 2010) (emphasis by

underlining added).

Here, Defendants were undisputedly "absolutely certain" that Mr. Barnes was

armed when the gun was spotted shortly after Mr. Barnes had answered the door.

Consequently, their right to seize Mr. Barnes from inside of his home and subject him

to a *Terry* detainment under the lesser constitutional standard of a reasonable

articulable suspicion existed. *See Croom v. Balkwill*, 645 F.3d 1240, 1246 (11th Cir.

2011) ("However, beginning with *Terry v. Ohio*, the Supreme Court has recognized

that certain types of limited detentions—*i.e.* seizures lacking the essential attributes of full, custodial arrests—may be constitutional even in the absence of probable cause."); *cf. Croom*, 645 F.3d at 1249 ("The officers' authority to detain Croom flowed not from the warrant, but rather from the Reasonableness Clause of the Fourth Amendment." (citing *Michigan v. Summers*, 452 U.S. 692, 697-706, 101 S. Ct. 2587, 2591-96, L. Ed. 2d 340 (1981))).[11]

---

[11]  The court acknowledges that the Eleventh Circuit's decision in *Morris v. Town of Lexington*, 748 F.3d 1316, 1323  (11th Cir. 2014), runs somewhat counter to the foregoing *Terry* analysis:

> Bradford and Bowers seek to overcome the presumption that their warrantless entry into the Morris residence was unreasonable with the argument that a warrant was not required at all; they had "reasonable suspicion" to detain Morris and, thus, to enter his house to do so. If not, the entry was not proscribed by clearly established law. We are not persuaded. Assuming for sake of argument that reasonable suspicion akin to that appearing in *Terry v. Ohio* would provide an exception to the Fourth Amendment's warrant requirement the officers lacked reasonable suspicion, or even arguable reasonable suspicion. As such, the officers' entry into the Morris residence, without a warrant, exigency, or reasonable suspicion, was contrary to clearly established Fourth Amendment law.

748 F.3d at 1323 (footnotes omitted); *see id.* n.17 ("As we have held, '[r]easonable suspicion cannot justify the warrantless search of a house.'" (quoting  *United States v. Tobin*, 923 F.2d 1506, 1511 (11th Cir. 1991))). However, later within the opinion, the Eleventh Circuit emphasized that the plaintiff who had opened his door to the police, "was not a man armed and presently dangerous, or a man who "ha[d] engaged in, or is about to engage in, criminal activity[.]" 748 F.3d at 1324. Additionally, the officers in *Morris* did not come to the plaintiff's property pursuant to an arrest warrant, but rather because of a 911 call made by a woman who was "standing outside [the plaintiff's] house" "claim[ing] 'vaguely and generally' that she was in danger and that someone had been beating [the plaintiff]'s horses" and who "made no accusations against [the plaintiff]." 748 F.3d at 1319. Accordingly, for these distinguishing reasons, *Morris* does not preclude the application of the *Terry* doctrine in this instance. In any event, *Morris* cannot clearly establish the illegality of Defendants' actions as that binding decision did not issue until over one year <u>after</u> the law enforcement incident involving Mr. Barnes.

17

The one firearm case cited by Mr. Barnes, *Florida v. J.L.*, 529 U.S. 266, 272, 120 S. Ct. 1375,146 L. Ed. 2d 254 (2000) (Doc. 57 at 14), is significantly dissimilar as it involved police seizing a hidden gun from a minor and charging that juvenile with various firearm crimes, 529 U.S. at 269, 120 S. Ct. at 1377, based upon an anonymous tip and not from law enforcement's own personal observations. *See J.L.*, 529 U.S. at 270, 120 S. Ct. at 1378 ("In the instant case, the officers' suspicion that J.L. was carrying a weapon arose not from any observations of their own but solely from a call made from an unknown location by an unknown caller."). As the Supreme Court held in *J.L.*, "an anonymous tip that a person is carrying a gun is, without more, [in]sufficient to justify a police officer's stop and frisk of that person." 529 U.S. at 268, 120 S. Ct. at 1377. In contrast to *J.L.*, the *Terry* seizure of Mr. Barnes on account of a concealed gun was based on personal observations by law enforcement.

Furthermore, Defendants' use of handcuffs during this investigatory stop was reasonable, given Mr. Barnes's possession of a pistol and their general concern for safety.[12] *See Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1305-06 (11th Cir. 2006) ("[D]uring an investigatory stop, an officer can still handcuff a detainee when the officer reasonably believes that the detainee presents a potential threat to safety."

---

[12] By virtue of this court's memorandum opinion and order (Doc. 37) entered on May 29, 2014, no count for excessive force as a discrete claim remains in Mr. Barnes's second amended complaint.

18

(citing *United States v. Hastamorir*, 881 F.2d 1551, 1557 (11th Cir. 1989))).

Alternatively, even if Defendants' seizure of Mr. Barnes violated his Fourth Amendment rights, qualified immunity insulates them from any liability for their unconstitutional actions. More specifically, "[a] law enforcement official who reasonably but mistakenly concludes that reasonable suspicion is present is still entitled to qualified immunity." *Jackson v. Sauls*, 206 F.3d 1156, 1165-66 (11th Cir. 2000). "When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop." *Jackson*, 206 F.3d at 1166 (citing *Williamson v. Mills*, 65 F.3d 155, 157 (11th Cir. 1995)).

When Defendants knocked on the door, no constitutionally-recognized seizure occurred. *Compare Jackson*, 206 F.3d at 116 ("[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." (internal quotation marks omitted) (quoting *Terry*, 392 U.S. at 16, 88 S. Ct. at 1877)), *with id.* ("It is only when an officer, 'by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.'" (quoting *Terry*, 392 U.S. at 19 n.16, 88 S. Ct. at 1879 n.16)); *cf. United States v. Taylor*, 458 F.3d 1201, 1204 ("Thus, '[o]fficers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the

inhabitants just an any private citizen may.'" (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 519 (3d Cir. 2003))). Under both sides' version of the facts, after hearing someone knocking loudly, Mr. Barnes admits that he answered the door with a firearm in his right hand which he attempted, unsuccessfully, to hide from the officers' view because he was concerned about their reaction if the pistol was spotted. In light of these undisputed and unsettling set of facts, a reasonable police officer could have believed that an <u>arguable</u> reasonable suspicion for stopping Mr. Barnes existed, regardless of the scope or validity of the arrest warrant for Mr. Blackburn.

Importantly, Mr. Barnes concedes that Defendants were engaged in discretionary functions and cites to no cases which establish the clearly or obviously unconstitutional nature of their actions. As the Eleventh Circuit has explained a plaintiff's burden in opposing qualified immunity in the absence a dispute over the issue of an officer's discretionary authority:

> In satisfying this burden, <u>the plaintiff cannot point to sweeping propositions of law</u> and simply posit that those propositions are applicable. Instead, <u>the plaintiff must draw the court's attention toward a more particularized and fact-specific inquiry</u> ... show[ing] that there existed sufficient case law establishing the contours of his or her constitutional rights such that the unlawfulness of the defendant's conduct would have been apparent to a reasonable official in the same circumstances.... If no such case law exists, then the defendant is entitled to qualified immunity.

*Nicholson v. Georgia Dept. of Human Resources,* 918 F.2d 145, 147 (11th Cir. 1990) (citations omitted); *see also Barts v. Joyner*, 865 F.2d 1187, 1190 (11th Cir. 1989) ("[P]laintiffs must prove the existence of a clear, *factually defined*, well-recognized right of which a reasonable police officer should have known.... *The right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful*." (First emphasis added.)) "Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." *Lassiter,* 28 F.3d at 1149 (citing *Malley v. Briggs*, 475 U.S. 335, 341-43, 106 S. Ct. 1092, 1096-97, 89 L. Ed. 2d 271 (1986)). Thus:

> When considering whether the law applicable to certain facts is clearly established, the facts of cases relied upon as precedent are important. The facts need not be the same as the facts of the immediate case. But they do need to be materially similar. *See, e.g., Edwards v. Gilbert*, 867 F.2d 1271, 1277 (11th Cir. 1989). Public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases.

> *Adams v. St. Lucie County Sheriff's Dept.*, 962 F.2d 1563, 1575 (11th Cir. 1992) (Edmondson, J., dissenting), *approved en banc*, 998 F.2d 923 (11th Cir. 1992). "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Lassiter*, 28 F.3d at 1150.

*Belcher v. City of Foley*, 30 F.3d 1390, 1395-96 (11th Cir. 1994) (emphasis by underlining added); *see also Santamorena v. Georgia Military College*, 147 F.3d 1337, 1340 (11th Cir. 1998) ("To overcome this immunity, Plaintiff has the burden

of pointing to case law which 'pre-date[s] the offic[ial]'s alleged improper conduct, involve[s] materially similar facts, and 'truly compel[s]' the conclusion that the plaintiff had a right under federal law.'" (quoting *Ensley v. Soper*, 142 F.3d 1402, 1406 (11th Cir. 1998))).

Here, Mr. Barnes, at best, has minimally cited to general legal principles governing Fourth Amendment seizure law without developing the requisite specificity that a qualified immunity case customarily demands from a plaintiff. Furthermore, the far from extreme factual nature of Mr. Barnes's federal seizure claim means that this constitutional violation does not fall within that extraordinary class of so-called "obvious clarity" cases in which no preexisting binding authority is necessary to provide a public official with fair warning of his unconstitutional behavior. *See Santamorena*, 147 F.3d at 1340 n.6 ("[T]hese exceptional cases <u>rarely</u> arise.") (emphasis added); *see also Gray*, 458 F.3d at 1307 (listing examples of cases coming within the narrow "obvious clarity" category and describing them as all involving challenged conduct falling "'well beyond the 'hazy border' that sometimes separates lawful conduct from unlawful conduct," such that every objectively reasonable officer would have known that the conduct was unlawful" (quoting *Evans v. Stephens*, 407 F.3d 1272, 1283 (11th Cir. 2005) (en banc))); *cf. Rodriguez v. Farrell*, 280 F.3d 1341, 1350 n.18 (11th Cir. 2002) ("We very occasionally encounter

22

the exceptional case in which a defendant officer's <u>acts are so egregious</u> that preexisting, fact-specific precedent was not necessary to give clear warning to every reasonable . . . officer that what the defendant officer was doing must be 'unreasonable' within the meaning of the Fourth Amendment.") (emphasis added); *Gray*, 458 F.3d at 1307 (concluding that officer's "conduct in handcuffing . . . a compliant [and unarmed], nine-year-old girl for the sole purpose of punishing her was an obvious violation of [the plaintiff's] Fourth Amendment rights"). Consequently, in opposing Defendants' qualified immunity defense on his unconstitutional seizure claim, Mr. Barnes has not met the clearly established law component and, summary judgment in favor of Defendants is alternatively appropriate for this independent reason.

### B.   Count Three–Illegal Search of Mr. Barnes's Residence

Count Three of Mr. Barnes's complaint contains allegations of an unconstitutional search of Mr. Barnes's home against Deputy Waldrop and Officers C. Lumpkin and Thompson only. More specifically, Mr. Barnes asserts that:

> By searching Plaintiff's home without a warrant and without probable cause, Defendants Waldrop, Cole Lumpkin, and Thompson, violated Plaintiff's right to be free from unreasonable searches, as guaranteed by the 4th Amendment and incorporated against the states via the 14th Amendment.

(Doc. 27 ¶ 43).

23

### Actions of Officers Thompson and C. Lumpkin

Mr. Barnes's illegal search claim against Officer Thompson is easily addressed. Mr. Barnes has admitted that Officer Thompson never entered his home on November 17, 2012. This factual admission necessarily means that Officer Thompson did not personally participate in the clearing of Mr. Barnes's house or otherwise enter the premises. Consequently, he cannot be liable to Mr. Barnes for any Fourth Amendment violation attributable to his entering the home without a warrant as alleged in Count Three. Thus, summary judgment in Officer Thompson's favor on this constitutional claim is due to be entered.

The illegal search claim against Officer C. Lumpkin, however, requires much more discussion. Officer C. Lumpkin does not dispute "that the warrant *per se* [naming Mr. Blackburn] did not authorize a search of [Mr. Barnes]'s home." (Doc. 60 at 2). Officer C. Lumpkin also maintains that the mistaken belief that Mr. Blackburn was residing at the home was not the impetus for his actions in entering Mr. Barnes's residence. *Id.*

Officer C. Lumpkin contends, instead, that after Mr. Barnes came to the door with a hidden firearm in his hand, either exigent circumstances (Doc. 54 at 27-29) or,

alternatively, the right to conduct a protective sweep (Doc. 52 at 17-19)[13] authorized him (and Officer S. Lumpkin) to enter the home without a warrant. The court addresses exigent circumstances first.

> The Fourth Amendment also prohibits warrantless searches of a person's home. *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002). This prohibition is not absolute, however. *Id.* One exception to the warrant requirement "is that the police may enter a private premises and conduct a search if 'exigent circumstances' mandate immediate action." *Id.* "[E]mergency situations involving endangerment to life fall squarely within the exigent circumstances exception." *Id.* at 1337; *id.* at 1335 ("The most urgent emergency situation excusing police compliance with the warrant requirement is, of course, the need to protect or preserve life."); *see also Mincey v. Arizona*, 437 U.S. 385, 392, 98 S. Ct. 2408, 2413, 57 L. Ed. 2d 290 (1978).
>
> For this exception to apply, <u>the officer must have both exigent circumstances and probable cause</u>. *Holloway*, 290 F.3d at 1337. When officers respond to an emergency, "the probable cause element may be satisfied where officers reasonably believe a person is in danger." *Id.* at 1338. The officer's conduct is "evaluated by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." *Id.* at 1339 (quotation marks omitted). In addition, the officer's "warrantless search must be strictly circumscribed by the exigencies which justify its initiation...." *Mincey*, 437 U.S. at 393, 98 S. Ct. at 2413 (quotation marks omitted).

*Roberts*, 643 F.3d at 905 (emphasis added).

An officer who relies upon the exigent circumstances exception bears the

---

[13] Deputy Waldrop was the defendant who expressly raised the protective sweep exception as being applicable to Officer C. Lumpkin's actions.

burden of showing why the doctrine applies. *See Coolidge v. New Hampshire*, 403
U.S. 443, 455, 91 S. Ct. 2022, 2032, 29 L. Ed. 2d 564 (1971) ("The exceptions [to the
warrantless searches rule] are 'jealously and carefully drawn,' and there must be 'a
showing by those who seek exemption . . . that the exigencies of the situation made
that course imperative." (footnote omitted) (emphasis added)); *cf. Sammons v. Taylor*,
967 F.2d 1533, 1543 (11th Cir. 1992) ("Because an inventory search is an exception
to the Fourth Amendment's warrant requirement, however, the government officer
has the burden to show that the requirements of the inventory search exception have
been met." (citing *Coolidge*, 403 U.S. at 455, 91 S. Ct. at 2032) (emphasis added)).

Situations in which the Eleventh Circuit has upheld a warrantless search of a
home based upon exigent circumstances include:

> [E]ntries to break up a violent fight, *Brigham City v. Stuart*, 547 U.S.
> 398, 126 S. Ct. 1943, 1949, 164 L. Ed. 2d 650 (2006), to prevent the
> destruction of evidence, *United States v. Mikell*, 102 F.3d 470, 476 (11th
> Cir. 1996), to put out a fire in a burning building, *Michigan v. Tyler*, 436
> U.S. 499, 509, 98 S. Ct. 1942, 56 L. Ed. 2d 486 (1978), to pursue a
> fleeing suspect, *United States v. Santana*, 427 U.S. 38, 42-43, 96 S. Ct.
> 2406, 49 L. Ed. 2d 300 (1976), to rescue a kidnapped infant, *United
> States v. Laboy*, 909 F.2d 581, 586 (1st Cir. 1990), and to attend to a
> stabbing victim, *United States v. Gillenwaters*, 890 F.2d 679, 682 (4th
> Cir. 1989).

*McClish v. Nugent*, 483 F.3d 1231, 1240-41 (11th Cir. 2007). None of these examples
reflects facts that are comparable to this case–a warrantless entry into a home after

an occupant, who was not the subject of an arrest warrant, answered the door with a gun in his hand that was partially hidden from law enforcement's view.

Additionally, the two cases cited in the Gadsden Officers' brief (Doc. 54 at 27) are significantly distinguishable. For example, *Roberts* deals with an officer's limited entry into the home of a plaintiff who had been threatening suicide. 643 F.3d at 906. The officer had come to the residence only after being "dispatched in response to a 911 call" from a concerned relative of the plaintiff. *Id.* The Eleventh Circuit first found no Fourth Amendment violation based upon the exigent circumstances doctrine and alternatively held that "no binding precedent . . . clearly established that probable cause and exigent circumstances immediately evaporate once an officer performing a welfare check for a possibly suicidal person sees that the person is merely alive." *Id.*

The second opinion, *United States v. Holloway*, 290 F.3d 1331, 1335 (11th Cir. 2002), likewise involves an emergency-related scenario, but procedurally reached the Eleventh Circuit as an evidentiary appeal in a criminal case. *See id.* at 1332 ("This case arises from a 911 call reporting gunshots and arguing originating from Appellant Robert Dale Holloway's residence."); *id.* ("On appeal, he argues the firearm and other evidence seized by the officers should have been suppressed as fruits of an unconstitutional search."). The Eleventh Circuit held that, in light of "the exigent

27

circumstances of gunshots and arguing originating from Appellant's residence, the

police officers were justified in conducting a warrantless search of the premises" and

further that "neither the emergency search of Appellant's residence nor the seizure

of the shotgun violated the Fourth Amendment's proscription against unreasonable

searches and seizures." 290 F.3d at 1341.

> As the *Holloway* court observed concerning an emergency situation:

> "One of the most compelling events giving rise to exigent circumstances is the occurrence of an emergency situation." *United States v. Holloway*, 290 F.3d 1331, 1335 (11th Cir. 2002). However, relying upon this particular exigent circumstances exception requires a police response to an emergency. *Id.* (citing *Vale v. Louisiana*, 399 U.S. 30, 35, 90 S. Ct. 1969, 1972, 26 L. Ed. 2d 409 (1970) (noting warrantless search could not be justified based on exigent circumstances, where police officers were not responding to an emergency); *McDonald v. United States*, 335 U.S. 451, 454, 69 S. Ct. 191, 193, 93 L. Ed. 153 (1948) ("Where, as here, officers are not responding to an emergency, there must be compelling reasons to justify the absence of a search warrant.").

*Holloway*, 290 F.3d at 1335.

> Citing to *Maryland v. Buie*, 494 U.S. 325, 327, 110 S. Ct. 1093, 1094, 108 L.

Ed. 2d 276 (1990), Defendants alternatively contend that Officer C. Lumpkin's entry

into Mr. Barnes's residence was authorized by the protective sweep doctrine.

> "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327, 110 S. Ct. 1093, 1094, 108 L. Ed. 2d 276 (1990). A protective sweep may also be

undertaken without an arrest warrant, so long as the officers are lawfully
within the premises due to, for example, the existence of exigent
circumstances. *United States v. Caraballo*, 595 F.3d 1214, 1224-25
(11th Cir. 2010). In order to conduct a protective sweep, an officer must
"possesses a reasonable belief based on specific and articulable facts
that the area to be swept harbors an individual posing a danger to those
on the arrest scene." *Buie*, 494 U.S. at 337, 110 S. Ct. at 1099-100.

   In order to perform a protective sweep that comports with the
   requirements of the Fourth Amendment, the officers must in the first
   place be lawfully within the premises. *See Caraballo*, 595 F.3d at 1224-
   25.

*United States v. Timmann*, 741 F.3d 1170, 1181 (11th Cir. 2013) (emphasis added).

The Eleventh Circuit concluded in *Timmann* that law enforcement's

warrantless entry and subsequent protective sweep were both improper:

   The situation the officers confronted in the instant case bears none
   of these indicia of an urgent, ongoing emergency. The officers here did
   not receive an emergency report regarding an ongoing disturbance, but
   rather a service call regarding what appeared to be a bullet hole, which
   circumstances known to the officers indicated had been made at least 39
   hours prior to when the officers made entry. When Officer Martin first
   arrived at the apartment building, she did not encounter a tumultuous
   scene, nor were the officers met with chaos when they returned to the
   building the next day. The officers observed no violent behavior, nor did
   they see or hear evidence that a fight had taken place or that anyone had
   been injured, other than finding a single bullet hole. Nor did the officers
   have any information that would lead them to suspect that Timmann
   might be suicidal, or that he might be home (in fact, the absence of his
   work vehicle indicated that he was likely not at home). Considering the
   totality of the circumstances, it was not reasonable for the officers to
   believe that someone inside Timmann's apartment was in danger and in
   need of immediate aid. Therefore, we find that the District Court erred
   in holding that the emergency aid exception justified the officers'

warrantless entry into Timmann's apartment. . . .

> In order to perform a protective sweep that comports with the requirements of the Fourth Amendment, the officers must in the first place be lawfully within the premises. *See Caraballo*, 595 F.3d at 1224-25. Because the officers' initial warrantless entry into Timmann's apartment was unreasonable under the Fourth Amendment, the officers were not lawfully on the premises. Thus, the District Court erred in holding that the officers' subsequent forced entry into Timmann's locked bedroom was a lawful protective sweep.

741 F.3d at 1180-81 (footnotes omitted) (emphasis added).

In challenging the entrance into and limited search of his residence, Mr. Barnes relies primarily upon the criminal case of *Steagald v. United States*, 451 U.S. 204, 101 S. Ct. 1642, 68 L. Ed. 2d 38 (1981). The Court framed the constitutional issue in *Steagald* as follows:

> Here, of course, the agents had a warrant—one authorizing the arrest of Ricky Lyons. However, the Fourth Amendment claim here is not being raised by Ricky Lyons. Instead, the challenge to the search is asserted by a person not named in the warrant who was convicted on the basis of evidence uncovered during a search of his residence for Ricky Lyons. Thus, the narrow issue before us is whether an arrest warrant—as opposed to a search warrant—is adequate to protect the Fourth Amendment interests of persons not named in the warrant, when their homes are searched without their consent and in the absence of exigent circumstances.

451 U.S. at 212, 101 S. Ct. at 1647-48 (emphasis added).

Deciding in favor of the person unnamed in the arrest warrant, the Supreme Court determined in *Steagald* that the petitioner's Fourth Amendment rights were

30

violated:

> In sum, two distinct interests were implicated by the search at issue here—Ricky Lyons' interest in being free from an unreasonable seizure and petitioner's interest in being free from an unreasonable search of his home. <u>Because the arrest warrant for Lyons addressed only the former interest, the search of petitioner's home was no more reasonable from petitioner's perspective than it would have been if conducted in the absence of any warrant.</u> Since warrantless searches of a home are impermissible absent consent or exigent circumstances, we conclude that the instant search violated the Fourth Amendment.

*Steagald*, 451 U.S. at 216, 101 S. Ct. 1649-50 (emphasis added).

As the Supreme Court further explained:

> Thus, <u>whether the arrest warrant issued in this case adequately safeguarded the interests protected by the Fourth Amendment depends upon what the warrant authorized the agents to do.</u> To be sure, the warrant embodied a judicial finding that there was probable cause to believe the Ricky Lyons had committed a felony, and the warrant therefore authorized the officers to seize Lyons. <u>However, the agents sought to do more than use the warrant to arrest Lyons in a public place or in his home; instead, they relied on the warrant as legal authority to enter the home of a third person based on their belief that Ricky Lyons might be a guest there.</u> Regardless of how reasonable this belief might have been, it was never subjected to the detached scrutiny of a judicial officer. Thus, while the warrant in this case may have protected Lyons from an unreasonable seizure, it did absolutely nothing to protect petitioner's privacy interest in being free from an unreasonable invasion and search of his home. Instead, petitioner's only protection from an illegal entry and search was the agent's personal determination of probable cause. In the absence of exigent circumstances, <u>we have consistently held that such judicially untested determinations are not reliable enough to justify an entry into a person's home to arrest him without a warrant, or a search of a home for objects in the absence of a search warrant.</u> *Payton v. New York, supra*; *Johnson v. United States,*

*supra*. <u>We see no reason to depart from this settled course when the search of a home is for a person rather than an object.</u>

*Steagald*, 451 U.S. at 213-14, 101 S. Ct. at 1648. Thus, an important distinction exists between the scope of the arrest warrant in *Steagald* showing no judicially-tested link to the third party's home address and the one before this court involving a geographical overlap between the last known address for Mr. Blackburn and the residence of Mr. Barnes–1222 Ratliff Street, Gadsden, Alabama.[14] (Doc. 50-6 at 1).[15]

As the Gadsden Officers describe the reasons for entering Mr. Barnes's residence:

> [O]fficers S. Lumpkin and C. Lumpkin entered the premises for the purpose of addressing the roommate who remained inside, insofar as his identity and whether he might be a threat, and then conducted a brief canvass of the house to make sure there were no other persons there who might threaten the officers. Implicit from the officers' testimony is the underlying idea that if one person met them at the door with a weapon,

---

[14] The court notes that Mr. Barnes, citing to Doc. 50-6, factually contends that the "warrant in question does not specify an address for Stephen Blackburn" and that "Investigator Sims put an address on the warrant paperwork, but the warrant itself (and the application for it) contain no address." (Doc. 57 at 2 ¶ 8). The court struggles to understand Mr. Barnes's point, especially as it pertains to the defendants that he has sued in his lawsuit. In any event, Doc. 50-6 contains a criminal "COMPLAINT" against Mr. Blackburn as well as a "WARRANT" for the arrest of Mr. Blackburn, both of which were signed by a magistrate judge on August 14, 2012. (*Id.* at 3, 1). The arrest warrant is the document reflecting Mr. Blackburn's address of 1222 Ratliff address. (*Id.* at 1). This address on the warrant is in turn linked to Mr. Blackburn's Alabama driver license (Doc. 50-7), which Mr. Barnes does not dispute was found by law enforcement as part of its investigation into the crime for which Mr. Blackburn was charged. (Doc. 57 at 2 ¶ 3). There is no evidence in the record that any of the defendants who came to Mr. Barnes's residence knew that Mr. Blackburn was no longer residing there.

[15] Any page references to Doc. 50-6 correspond with the court's CM/ECF numbering system.

there may be others in the house with a weapon. Likewise, they still did not know exactly who was who, or who lived there, and they were now dealing with a tense situation wherein they felt endangered for their safety and the safety of other officers. Both Lumpkins testified that they briefly entered each room to determine whether there were any other persons there, and did nothing more. This testimony is unrefuted. What the testimony describes is conduct that meets the requirements of having both exigent circumstances and probable cause. *Roberts*' language calling for an officer's conduct to be evaluated by reference to the circumstances then confronting the officer, further underscores what the officers were doing:  In light of the apparent, albeit momentary, show of force by the plaintiff, the officers needed a prompt assessment of the ambiguous information that had been provided to them – was there anyone else in the house who might come out with a similarly loaded gun. By "clearing" the house, to use their term, and conducting no further intrusive search than to search for persons, the officers' warrantless search was indeed properly circumscribed by the exigency that justified its initiation. All they did was make sure no one else was going to come out and surprise them with a gun.

(Doc. 54 at 28-29).

Against this backdrop, the court finds that the constitutionality of Officer C. Lumpkin's conduct in entering Mr. Barnes's residence without his consent to be debatable under the Fourth Amendment (*i.e.*, (i) no probable cause to believe that Mr. Barnes had committed any crime to directly justify an emergency-based exigent circumstances exception to the warrantless entry rule, and (ii) an attempted, but no actual execution of an arrest warrant against Mr. Blackburn (who was not presently living there) to directly justify a protective sweep exception to the warrantless entry rule). Bolstering this conclusion is the recognition that Officer C. Lumpkin bears the

burden of demonstrating that an exception to the Fourth Amendment's warrantless entry rule applies. *See, e.g., Buie*, 494 U.S. at 337, 110 S. Ct. at 1100 (Stevens, J. concurring) ("In this case, to justify Officer Frolich's entry into the basement [to undergo a protective sweep], it is the State's burden to demonstrate that the officers had a reasonable basis for believing not only that someone in the basement might attack them or otherwise try to interfere with the arrest, but also that it would be safer to go down the stairs instead of simply guarding them from above until respondent had been removed from the house."); *Timmann*, 741 F.3d at 1178-79 ("The government bears the burden of demonstrating that the [exigent circumstances] exception applies." (citing *Holloway*, 290 F.3d at 1337)).

Nonetheless, the court concludes that Officer C. Lumpkins's actions, in the context of (i) trying to execute an arrest warrant for Mr. Blackburn that listed 1222 Ratliff Street, Gadsden, Alabama as his residential address; (ii) discovering Mr. Barnes's surprisingly armed status after he had answered the door; and (iii) dealing with the uncertain and potentially unsafe circumstances of additional armed persons within the premises, did not violate clearly established Fourth Amendment law. *Cf. United States v. Yeary*, 740 F.3d 569, 580 (11th Cir. 2014) ("[T]he arrest warrant, standing alone, would have given deputies the authority to enter the home." (citing *Payton v. New York*, 445 U.S. 573, 603, 100 S. Ct. 1371, 1388, 63 L. Ed. 2d 639

34

(1980) ("[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."))). Defendants initially went to Mr. Barnes's residence with the arrest warrant for Mr. Blackburn because the address listed on Mr. Blackburn's driver license was the same property. If Mr. Blackburn had been on the premises, Defendants' limited entry into the home to execute that arrest warrant even in the absence of a separate search warrant would have been permissible under clearly established Fourth Amendment. *See Steagald*, 451 U.S. at 214 n.7, 101 S. Ct. at 1648 n.7 ("Because an arrest warrant authorizes the police to deprive a person of his liberty, it necessarily also authorizes a limited invasion of that person's privacy interest when it is necessary to arrest him in his home.").

While Mr. Barnes was not the subject of the arrest warrant which the officers were attempting to execute and also was never charged with a crime, his answering the door with a <u>hidden firearm</u> escalated the situation, reasonably caused a concern for officer safety, and resulted in Mr. Barnes's seizure, including being handcuffed. Under such fluid and unusual circumstances, including the presence of Mr. Mathis within the residence and the potential for other unknown and, perhaps armed, persons on the premises, it did not so obviously or plainly violate the Fourth Amendment for Officer C. Lumpkin (along with Officer S. Lumpkin) to undergo a limited protective

sweep of the premises to make sure no other armed occupants were inside and ensure the officers' safety at the scene. *Cf. Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 289-99, 87 S. Ct. 1642, 1646, 18 L. Ed. 2d 782 (1967) ("The Fourth Amendment does not require police officers to delay in the course of an investigation <u>if to do so would gravely endanger their lives or the lives of others.</u>") (emphasis added); *United States v. Burgos*, 720 F.2d 1520, 1526  (11th Cir. 1983) ("Law enforcement officers who have lawfully apprehended a suspect on a portion of a structure (here it was an open porch built as a part of the home) <u>which they have reason to believe contains dangerous third persons who might pose a threat to their safety have a right to conduct a reasonable security check of such premises.</u>") (emphasis added); *McClish*, 483 F.3d at 1242, 1245-46 (finding absence of exigent circumstances in "reaching through McClish's open doorway to effect the arrest" without an arrest warrant due in part to "no hint of any threat to officer safety from an <u>unarmed</u>, 75–year old man opening the door in his bathrobe at 11:30 p.m.") (emphasis added).

Importantly, none of the cases cited by Mr. Barnes deals with an on-point binding factual scenario in which a non-party to an arrest warrant answered law enforcement's knock on the door to his residence with a hidden pistol. Further, nothing in the record suggests the occurrence of an obvious constitutional breach such as a sweep that expanded into an exhaustive and time-consuming search of Mr.

36

Barnes's residence. *See United States v. Rodgers*, 924 F.2d 219, 222 (describing a protective sweep as being "narrowly confined to a cursory visual inspection of those places in which a person might be hiding") (internal quotation marks omitted) (quoting *Buie*, 494 U.S. at 327, 110 S. Ct. at 1094). Consequently, to the extent that the protective sweep infringed upon Mr. Barnes's Fourth Amendment rights, in the absence of crossing the line of clearly established law, qualified immunity protects Officer C. Lumpkin from any personal liability for his conduct. *See Saucier*, 533 U.S. at 205, 121 S. Ct. at 2158 ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct."); *id.* ("It is sometimes difficult for an officer to determine how the relevant legal doctrine, here [warrantless entries into a home], will apply to the factual situation the officer confronts."); *see also Evans*, 407 F.3d at 1283 ("Seldom does a general standard such as 'to act reasonably' put officers on notice that certain conduct will violate federal law given the precise circumstances before them: Fourth Amendment law is intensely fact specific."); *McClish*, 483 F.3d at 1249-50 ("If the role of the 'clearly established' prong of the qualified immunity inquiry is to 'acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct,' *Saucier*, 533 U.S. at 205, 121 S. Ct. 2151, the apparent tension between *Santana* and *Payton* [which reach different constitutional outcomes

on warrantless entries into a residence resulting in an arrest] requires such an honest

acknowledgment here.").

### Subsequent Entry and Seizure by Deputy Waldrop

After the residence had been secured by other officers, Deputy Waldrop told

Mr. Barnes to go inside and Deputy Waldrop went with him. Mr. Barnes contends

that

> Waldrop did not and cannot state a justification for re-entering Barnes' home and threatening Barnes in this way. Waldrop's protective sweep was finished. Once it was done, there no longer could have been a need to enter Barnes' home yet again. Even if entry at one time was legal, either pursuant to the warrant to arrest Blackburn, or under a protective sweep theory, Waldrop's re-entry into Barnes' home was nothing more than a gratuitous display of abuse of power for no other reason than to intimidate Barnes.

(Doc. 57 at 14-15).

As Deputy Waldrop explains the circumstances of this entering in his reply

brief:

> In regard to Waldrop's entering the home with Plaintiff, there is no evidence that Plaintiff attempted to prevent him. The undisputed evidence is clear that they went into the residence together to discuss Plaintiff's actions. It was a conversation, which became heated by Plaintiff, but the entry was simply to converse, not search. Waldrop was in the residence for a minute. At most, this scenario is an example of implied consent and not a constitutional violation. *See e.g. United States v. Ramirez-Chilel*, 289 F.3d 744 (11th Cir. 2002). Arguably, the Fourth Amendment is not even in issue in this scenario because the purpose of the entry was not to conduct a search.

(Doc. 59 at 5 (emphasis added)).

Neither side has provided the court with much in terms of on-point case authority for their respective positions regarding Deputy Waldrop's subsequent entry into Mr. Barnes's home. In *O'Rourke v. Hayes*, 378 F.3d 1201 (11th Cir. 2004), the Eleventh Circuit held that the "mere entry" of a police officer into a private business building with an arrest warrant for a specific person, but without a warrant to search the commercial premises, constituted an unreasonable search. *See id.* at 1208 ("Even if he did not actually rummage around the office or go through closets or cabinets, his mere presence inside revealed to him things that he would otherwise have been unable to ascertain."). *O'Rourke* was decided well before the facts of this lawsuit took place and put Deputy Waldrop on clear notice that his post-sweep warrantless entry onto Mr. Barnes's private property (absent a concern for safety or other exigent circumstances) violated the Fourth Amendment. Consequently, while qualified immunity protects the officers who conducted the initial sweep of Mr. Barnes's home from liability, Deputy Waldrop's actions, which occurred <u>well after</u> the point in which any arguably threatening situation for law enforcement had ceased, are plainly wrong. *See, e.g., Steagald*, 451 U.S. at 214 n.7, 101 S. Ct. at 1648 n.7 ("As previously noted, absent exigent circumstances or consent, <u>an entry into a private dwelling to conduct a search or effect an arrest is unreasonable without a warrant</u>.") (emphasis added).

Alternatively and although not expressly argued by Mr. Barnes, Deputy Waldrop's actions in ordering Mr. Barnes to go inside the home with him after the sweep could constitute an illegal seizure of Mr. Barnes because, in doing so, Deputy Waldrop was restraining Mr. Barnes's liberty without any valid law enforcement or safety reason for doing so. *See Roberts*, 643 F.3d at 905 ("An encounter between a police officer and a citizen becomes a seizure when 'a reasonable person would not feel free to terminate the encounter.'" (quoting *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011) (quotation marks omitted))). Importantly, the record, taken in the light most favorable to Mr. Barnes, reveals the one-sided nature of the post-sweep exchange between Mr. Barnes and Deputy Waldrop, <u>made at the insistence of Deputy Waldrop</u>.

While Deputy Waldrop superficially contends that a reasonable officer could have mistakenly believed that Mr. Barnes implicitly consented to his post-sweep commands and entry,[16] he fails to develop <u>any</u> facts to support this contention. *Cf. United States v. Ramirez-Chilel*, 289 F.3d 744, 752 (11th Cir. 2002) ("Although the officers did not receive any explicit verbal consent from Ramirez-Chilel to enter, the

---

[16] Of course, Mr. Barnes initially showed resistance to all the defendants by carrying a concealed pistol when answering the knock on his door.

officers did receive some sort of <u>implied consent to enter from Ramirez-Chilel's body language</u> that was not present in *Gonzalez*.") (emphasis added); *id.* ("[W]e find the officers' entry to be legal because we find no official show of force which would have 'forced' the defendant to let the officers in, and we also find that Ramirez-Chilel demonstrated his consent to entry by 'yielding the right-of-way' for the officers to enter.").

Moreover, to the extent Deputy Waldrop relies upon Mr. Barnes's silence as a signal for permission to go inside Mr. Barnes's home "to talk," his position is completely at odds with binding Eleventh Circuit authority to the contrary:

> We have previously noted our hesitancy to find implied consent (*i.e.*, consent by silence) in the Fourth Amendment context, *see United States v. Berry*, 670 F.2d 583, 596 (5th Cir. Unit B 1982) (en banc), and we agree with our colleagues in the Ninth Circuit that, <u>whatever relevance the implied consent doctrine may have in other contexts, it is inappropriate to "sanction[ ] entry into the home based upon inferred consent.</u>"

*United States v. Gonzalez*, 71 F.3d 819, 830 (11th Cir. 1996) (footnote omitted) (emphasis added) (quoting *United States v. Shaibu*, 920 F.2d 1423, 1426 (9th Cir. 1990)), *overruled on other grounds by Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009); *McClish*, 483 F.3d at 1241 ("The record does not reveal that McClish consented, and we have held that 'whatever relevance the implied consent doctrine may have in other contexts, it is inappropriate to sanction *entry* into

41

the home based upon inferred consent.'" (quoting *Gonzalez*, 71 F.3d at 830) (emphasis added, alteration and quotation marks omitted)).

Here, the facts, taken in a light most reasonable to Mr. Barnes, are that Deputy Waldrop followed Mr. Barnes into his home after instructing Mr. Barnes to go inside. The record does not show that Mr. Barnes ever verbally (or somehow non-verbally through his body language implicitly) consented to Deputy Waldrop's subsequent orders and entry into his home. Under such circumstances, the law on implicit consent was clearly established by *McClish* and no reasonable officer could have believed that Mr. Barnes implicitly consented to that subsequent seizure of him and warrantless entry into his home.

Accordingly, Deputy Waldrop's Motion is **DENIED** on this Fourth Amendment (and final remaining) claim of Mr. Barnes's complaint.

## V.   CONCLUSION

Therefore, for the reasons stated above, the Gadsden Officers' Motion is **GRANTED** as to all remaining counts of Mr. Frazier's second amended complaint. Deputy Waldrop's Motion is **GRANTED** as to the illegal seizure claim premised upon the initial doorway encounter with Mr. Barnes only and is otherwise **DENIED**. The court will set this case for a final pretrial conference by separate order.

**DONE** and **ORDERED** this 23rd day of September, 2015.

**VIRGINIA EMERSON HOPKINS**
United States District Judge